1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   DORA ALVAREZ GALLEGOS,                    CASE NO. 01cv1874 DMS (JMA)

12                          Plaintiff,         **ORDER DENYING**
                                                **DEFENDANTS' MOTION TO**
            vs.                                 **DISMISS**
13
                                                **[Docket No. 113]**
14   JOHN PARSONS, M.D., et al.,

15                          Defendants.

16          This matter comes before the Court on Defendants' motion to dismiss the Complaint.  Plaintiff

17   filed an opposition to the motion, and Defendants filed a reply.  For the reasons set out below, the

18   Court denies Defendants' motion.

19                                              **I.**

20                              **PROCEDURAL BACKGROUND**

21          On October 15, 2001, Gerardo Richard Gallegos, a state prisoner proceeding *pro se*, filed the

22   original Complaint in this case.  That Complaint alleged that Defendants John Parsons, M.D., Charles

23   Pickett, M.D., Sunil Walia, M.D. and James S. Burrell, M.D. were deliberately indifferent to

24   Gallegos's serious medical needs in that they failed to diagnose and treat Plaintiff's stomach cancer.

25   Gallegos also alleged an equal protection claim arising from these same facts.

26          On April 2, 2002, Gallegos filed a First Amended Complaint with the assistance of pro bono

27   counsel in which he alleged the same claims against the same Defendants.

28   / / /

On April 22, 2002, Defendants Parsons and Pickett filed a motion to dismiss the First Amended Complaint. Defendants Burrell and Walia filed a motion to dismiss the First Amended Complaint on June 3, 2002. On July 18, 2002, the Court denied both motions.

On October 14, 2003, this case was transferred from the calendar of the Honorable Jeffrey T. Miller to the calendar of the Honorable Dana M. Sabraw. On March 4, 2004, Defendants Parsons and Walia filed a motion for summary judgment in which they asserted that Gallegos had failed to satisfy the exhaustion requirement.[1] After reviewing the parties briefs and hearing oral argument, the Court granted the motion.

Gallegos appealed that decision to the United States Court of Appeal for the Ninth Circuit. While that appeal was pending, Gallegos died prompting the Ninth Circuit to substitute Gallegos's wife Dora Alvarez Gallegos as the Plaintiff in this case. The Ninth Circuit thereafter reversed this Court's summary judgment ruling and remanded the case for further proceedings. After remand, Defendants filed the present motion to dismiss in which they reallege that Gallegos failed to exhaust his administrative remedies.

## II.

## FACTUAL BACKGROUND

Prior to his death, Gallegos was an inmate in the California prison system. (First Am. Compl. at ¶ 4.) At all relevant times, he was incarcerated at Centinela State Prison in Imperial County, California. (*Id.* at ¶ 5.) Defendant Parsons was employed as the Chief Medical Doctor at Centinela, (*id.* at ¶ 6), and Defendant Walia was employed as a medical doctor at Centinela. (*Id.* at ¶ 8.)

In 1996, while Gallegos was incarcerated in Tehachapi State Prison, he began to experience ongoing episodes of weight loss, stomach upset, and severe pain and burning in his abdominal region. (*Id.* at ¶ 11.) He was seen by prison doctors more than fifteen times for these symptoms. (*Id.*) On or about August 1, 1996, Gallegos was admitted to the prison infirmary where the doctors performed an upper barium x-ray. (*Id.*) They diagnosed Gallegos as suffering from an "obstructing sternic lesion," with the primary clinical consideration being an abnormal growth in Gallegos' stomach. (*Id.*)

---

[1] Defendants Burrell and Pickett were dismissed with prejudice on March 8, 2004.

01cv1874

1   / / /

2       In late 1996, Gallegos was admitted to San Joaquin Community Hospital where he was treated

3   by a non-prison doctor, Dr. N. Sarkies.  (*Id.* at ¶ 12.)  Dr. Sarkies performed an endoscopy, biopsies

4   and a workup to rule out a malignancy in Gallegos's stomach.  (*Id.*)  Dr. Sarkies treated Gallegos for

5   a stomach ulcer and recommended an abdominal CT scan if Gallegos's symptoms reappeared.  (*Id.*)

6       Gallegos was returned to Tehachapi where he was treated for "multiple deep ulcerations" with

7   a regimen of Prilosec, Pepto-Bismol and antibiotics.  (*Id.* at ¶ 13.)  Within weeks, Gallegos's

8   symptoms reappeared.  (*Id.*)  On January 7, 1997, he underwent an upper GI barium x-ray, and was

9   told that no abnormal growths were found.  (*Id.*)  Despite the persistence of symptoms, the prison

10  doctors did not follow Dr. Sarkies' recommendation that Gallegos have an abdominal CT scan.  (*Id.*)

11      In October 1997, Gallegos was transferred to a non-medical prison facility in Lancaster,

12  California, where his symptoms continued to increase.  (*Id.* at ¶ 14.)  He reported these symptoms to

13  prison doctors, who continued to treat him with ulcer medications.  (*Id.*)

14      In June 1998, Gallegos was transferred to Centinela where he came under the care of

15  Defendants, who continued to treat him for an ulcer.  (*Id.* at ¶ 15.)  Defendant Walia saw Gallegos on

16  July 3, 1998, and noted that he should receive a GI consult with a non-prison gastrointestinal

17  specialist, Dr. Hamdy.  (*Id.* at ¶ 17.)  Another doctor saw Gallegos on July 9, August 8, and September

18  30, 1998, for continuing symptoms, but that doctor did not perform a CT scan as recommended by Dr.

19  Sarkies and did not provide the GI consult with Dr. Hamdy.  (*Id.* at ¶ 18.)  Instead, he continued to

20  treat Gallegos for an ulcer.  (*Id.*)

21      On April 27, 1999, Defendant Burrell saw Gallegos for his continuing symptoms, and

22  continued with the ulcer treatment.  (*Id.* at ¶ 19.)

23      Soon thereafter, Gallegos began losing weight at a rapid pace.  (*Id.* at ¶ 20.)

24      On August 5, 1999, Defendant Walia saw Gallegos again.  (*Id.* at ¶ 21.)  Gallegos complained

25  of the same symptoms.  (*Id.*)

26      More than two months later, Gallegos finally had his consult with Dr. Hamdy.  (*Id.* at ¶ 22.)

27  Dr. Hamdy told Gallegos that the treatment he was receiving was of "no help," and that he needed to

28  have an endoscopy.  (*Id.*)

1   ///

2      Within a week of his consult with Dr. Hamdy, Gallegos was seen by Defendant Parsons.  (*Id.*

3   at ¶ 24.)  Defendant Parsons granted Gallegos a three-day "lay-in" from his work assignment, and

4   ordered a laboratory blood panel to be performed.  (*Id.*)  After reviewing the lab results, Defendant

5   Parsons concluded that Gallegos was suffering from "moderate anemia," and ordered him to return

6   to his work assignment despite his deteriorating health and ongoing complaints.  (*Id.* at ¶ 25.)

7      Defendant Parsons saw Gallegos less than two weeks later, and noted that Dr. Hamdy would

8   perform an upper endoscopy on December 1, 1999.  (*Id.* at ¶ 26.)

9      On that date, Gallegos was taken to the El Centro Regional Medical Center, where an

10   esophagogastroduodenoscopy with biopsies of the antrum was performed.  (*Id.* at ¶ 29.)  The biopsy

11   showed "moderately differentiated adenocarcinoma and follicular gastritis."  (*Id.*)

12      On December 7, 1999, Gallegos was awakened in the middle of the night and told that he was

13   being transferred to San Diego.  (*Id.* at ¶ 30.)  Gallegos was not told anything about his medical

14   condition or why he was being transferred despite his repeated requests for that information.  (*Id.*)

15   Gallegos was transferred to Alvarado Hospital Medical Center where he was instructed to sign a

16   medical authorization for surgery.  (*Id.*)  A staff doctor at the hospital told him he had cancer, and that

17   he must undergo emergency surgery to excise a gastric cancer.  (*Id.*)  This was the first time Gallegos

18   was told he had cancer.  (*Id.* at ¶ 31.)

19      Based on the information Gallegos received from the prison doctors that he had an ulcer,

20   Gallegos resisted signing the authorization form, and told the hospital staff there had been a mistake.

21   (*Id.* at ¶ 32.)  The hospital doctors persuaded Gallegos that he did have cancer and that the surgery was

22   necessary to save his life, and Gallegos agreed to have the surgery.  (*Id.*)  The hospital doctors

23   performed a radical gastrectomy for adenocarcinoma in which a significant section of Gallegos's

24   stomach was removed along with the cancerous tissue.  (*Id.* at ¶ 33.)

25      After the surgery, Gallegos was put into belly chains and leg irons, and mistakenly transported

26   to Donovan State Prison.  (*Id.* at ¶ 34.)  His post-surgery treatment consisted of Tylenol, even though

27   the prison doctor knew Gallegos was recovering from surgery.  (*Id.*)

28   ///

1   / / /

2       On December 24, 1999, Gallegos was transferred back to Centinela, but received minimal

3   post-surgical treatment from the prison doctors.  (*Id.* at ¶ 35.)  The surgical tubing in his stomach was

4   pulled out of his abdomen more than a week late, which caused him severe pain and anguish.  (*Id.*)

5

6       In August of 2000, Gallegos was transferred to the California Men's Colony in San Luis

7   Obispo ("CMC"), where he remained until his death in 2007.

8                                                  **III.**

9                                            **DISCUSSION**

10      The Prison Litigation Reform Act ("PLRA") amended 42 U.S.C. § 1997e(a) to provide that

11  "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner

12  confined in any jail, prison or other correctional facility until such administrative remedies as are

13  available are exhausted."  42 U.S.C. § 1997e(a).  "Once within the discretion of the district court,

14  exhaustion in cases covered by § 1997e(a) is now mandatory."  *Porter v. Nussle*, 534 U.S. 516, 532

15  (2002).  Section 1997e(a) has been construed broadly to "afford[ ] corrections officials time and

16  opportunity to address complaints internally before allowing the initiation of a federal case," *id.* at

17  525, and to encompass inmate suits about both general circumstances and particular episodes of prison

18  life.  *Id.* at 532.  Finally, "[t]he 'available' 'remed[y]' must be 'exhausted' before a complaint under

19  § 1983 may be entertained," "regardless of the relief offered through administrative procedures."

20  *Booth v. Churner*, 532 U.S. 731, 738, 741 (2001); *see also McKinney v. Carey*, 311 F.3d 1198, 1200-

21  01 (9th Cir. 2002) (finding that prisoner's civil rights action must be dismissed without prejudice

22  unless prisoner exhausted available administrative remedies *before* he filed suit, even if he fully

23  exhausts while the suit is pending).

24      The State of California provides its prisoners and parolees the right to administratively appeal

25  "any departmental decision, action, condition or policy perceived by those individuals as adversely

26  affecting their welfare."  Cal. Code Regs., tit. 15 § 3084.1(a).  In order to exhaust available

27  administrative remedies within this system, a prisoner must proceed through several levels: (1)

28  informal resolution, (2) first formal written appeal on a CDC 602 inmate appeal form, (3) second level

1  appeal to the institution head or designee, and (4) third level appeal to the Director of the California

2  Department of Corrections.  Cal. Code Regs. tit. 15 § 3084.5; *Vaden v. Summerhill*, 449 F.3d 1047,

3  1049 (9th Cir. 2006).   The third or "Director's Level" of review "shall be final and exhausts all

4  administrative remedies available in the Department [of Corrections.]"  *See* Cal. Dep't of Corrections

5  Operations Manual, § 54100.11, "Levels of Review;" *Irvin v. Zamora*, 161 F. Supp. 2d 1125, 1129

6  (S.D. Cal. 2001); *Barry v. Ratelle*, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).

7       It is well established that the failure to exhaust administrative remedies is an affirmative

8  defense under the PLRA which the Defendants must plead and prove.  *See Jones v. Bock*, 549 U.S.

9  199 (2007).  Here, Defendants assert they have met that burden through the declarations of D.J.

10 Engler, the Appeals Coordinator at CMC, N. Grannis, Chief of Inmate Appeals, and Candi Cook, the

11 former Medical Appeals Analyst at Centinela.  Engler states that he reviewed the inmate tracking

12 system at CMC, and found two appeals filed by Gallegos.  (Decl. of D.J. Engler in Supp. of Mot. at

13 ¶¶ 2-3.) The first appeal was rejected at the second level of review, and the second appeal was granted

14 at the second level of review on January 17, 2002.  (Id. at ¶ 3.)  According to Grannis' declaration,

15 Gallegos requested third level review of the rejection of his first appeal, but that request was screened

16 out pursuant to California Code of Regulations tit. 15,  § 3084(c)(3).  (Decl. of N. Grannis in Supp.

17 of Mot. at ¶ 8.)  Ms. Cook states that she reviewed all inmate medical grievances filed at Centinela

18 between 1998 and 2001, and did not find any from Gallegos.  (Decl. of Candi Cook in Supp. of Mot.

19 at ¶¶ 2-3.)

20      None of this evidence, however, addresses Plaintiff's argument that Gallegos satisfied the

21 exhaustion requirement by filing informal grievances while at Centinela, all of which were granted

22 at the informal level.  Instead, Defendants argue Plaintiff failed to provide any evidence of these

23 informal grievances, therefore his claims are unexhausted.  However, Plaintiff is not required to come

24 forward with any evidence of exhaustion.  Rather, it is Defendants' burden to prove the absence

25 thereof.  *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).  The evidence submitted here does not

26 satisfy that burden.

27 ///

28 ///

1    / / /

2    / / /

3

## IV.

## CONCLUSION AND ORDER

For this reason, the Court denies Defendants' motion to dismiss.

**IT IS SO ORDERED.**

DATED:  November 4, 2009

_____

HON. DANA M. SABRAW
United States District Judge

01cv1874